# RUTAN et al. v. HUCK.

No. 1600.   Decided January 22, 1906 (83 Pac. 833.)

1. TRUSTS—PURCHASE OF STOCK—FRAUD—EVIDENCE.—Evidence, in an action for a decree, that defendant held stock of a mining company in trust for plaintiff under a contract by which plaintiff, a mining expert, was to furnish his skill in the selection of mining properties, and defendant was to furnish the capital, plaintiff to have a third of the profits after the reimbursement of defendant, *held* sufficient to sustain a finding that plaintiff's conduct in the matter of the purchase was not fraudulent as to defendant.

2. SAME—COMPLAINT.—A complaint, alleging that on or about a certain date plaintiff, a mining expert, entered into a contract with defendant to engage in the purchase of mining properties, plaintiff to furnish his skill and to pass on the values of properties, and defendant to furnish the capital, plaintiff to have a third of the profits after reimbursement of defendant, and that in accordance with said contract a certain property was bought and title taken in defendant's name, as to which an accounting is sought, will be *held* to refer to a contract made prior to the date alleged in the complaint, which was to the effect alleged; a contract between the parties of that date being in regard to a different subject-matter.

3. SAME—PURCHASE PURSUANT TO CONTRACT—EVIDENCE.—Evidence, in an action to hold defendant as trustee for plaintiff for a third of certain mining stock standing in his name, *held* sufficient to show that it was purchased pursuant to a contract by which plaintiff, a mining expert, and defendant, a capitalist, should engage in the purchase of mining properties; plaintiff to have a third interest after defendant had been reimbursed for the money he was to advance.

4. COMPROMISE AND SETTLEMENT—EVIDENCE.—Plaintiff, a mining expert, made a contract with defendant, a capitalist, whereby they were to engage in purchasing mining properties, to be taken in defendant's name; he to furnish the money and plaintiff to examine and pass on the value of the properties; plaintiff to have a third interest after defendant was reimbursed.  After long and unsuccessful search for a property, which plaintiff would recommend, he in the meantime having personally paid $3,000 on account of traveling expenses, he found a property, on which, after a thorough examination, he made a most favorable report, to which he adhered, notwithstanding the adverse reports of other experts; and though the property was too large for defendant to handle, he, on the urgent recommendation of plaintiff, took a quarter interest in it, K. taking a

half interest, and A. the other quarter interest. After the signing of the contract by which defendant acquired his interest, he handed his check for $1,000 to plaintiff, accompanied by a letter dictated by A., stating that he was instructed by the gentlemen associated in the deal to hand plaintiff the inclosed check "as a slight recognition of our appreciation of your services in connection with the transactions. I am also requested to say to you that, notwithstanding you have declared that you have no claim against the proposed purchasers, . . . the gentlemen interested intend, in the event that the development justifies your report, to add to the remuneration here made in a substantial manner." Of the $1,000, defendant and A. each contributed $250, and B. $500. *Held*, that the retention of the check by plaintiff was not conclusive either that defendant had not purchased his quarter interest pursuant to the original agreement between him and plaintiff, or of a settlement between them.

5. SAME—PLEADING.—A matter may not be held a settlement of plaintiff's claim under the contract, which is the basis of the action, not having been pleaded as such.

6. ASSIGNMENTS—CONSIDERATION—RIGHT TO QUESTION.—Defendant, in an action against him on his contract with one of the plaintiffs, may not object that the assignment by such plaintiff to the other plaintiff of an interest in the contract was without consideration.

7. EVIDENCE—HEARSAY.—That plaintiff got a commission for selling the mine of S. may not, in an action on a contract by which plaintiff and defendant agreed to engage in mining deals, sharing in the profits, be shown by statements to that effect in the letters of third persons, in no wise representing plaintiff; the statements being hearsay.

8. PARTNERSHIP—FRAUD AS TO PARTNER.—Where plaintiff, a mining expert, entered into an agreement with defendant, whereby plaintiff was to examine and report on the values of mines, and defendant was to buy some that were satisfactory, taking title in his name, plaintiff to have a third interest after the reimbursement of defendant, plaintiff cannot, in an action for an accounting under the contract, be held to have committed a fraud on defendant in receiving a commission from the owner of the S. mine for making a sale of it, but at most defendant could require plaintiff as his partner to account for it; the facts being that plaintiff having examined and reported favorably on the S. and the L. mines, and defendant having asserted that he would not take an interest in the S. mine, and being undecided as to whether he would take an interest in the L. mine, plaintiff got K. to take an option on the two mines, and thereafter defendant was allowed to take an interest in the L. mine under the option of the same terms as K., which were unaffected by plaintiff receiving a commission on the sale of the S. mine.

9. SAME—ACCOUNTING.—Where plaintiff, a mining expert, made a contract with defendant, whereby plaintiff was to examine and report on the value of mines, defendant to make purchases in his name, and plaintiff to have a third of the proceeds after reimbursement of defendant for his expenditures, and defendant being unable to meet assessments on a mining property he had bought, and to retain all his interest in the mine, sold part of his interest, in good faith, at a price not shown to be less than its then value, defendant, on an accounting, may, with respect to the interest sold, be charged only with what he obtained for it.

McCARTY, J., dissenting.

APPEAL from District Court, Piute County; John F. Chidester, Judge.

Action by Frank C. Rutan and another against Louis C. Huck. Judgment for plaintiffs. Defendant appeals.

MODIFIED.

*Henderson, Pierce, Critchlow & Barrette, Dickson Ellis, Ellis & Shulder* for appellant.

*John M. Zane, Wm. A. Vincent, W. I. Snyder* and *Bismark Snyder* for respondents.

### APPELLANT'S POINTS.

"One who attempts to act as the agent of both parties to a transaction without disclosing that fact to his principals, is precluded from recovering compensation for his services." (*Boyd v. Dullaghan*, 33 Ill. App. 267; *Rice v. Davis*, 136 Penn. St. 439, 20 Am. St. Rep. 933, 1 Am. & Eng. Ency. of Law [2 Ed.], p. 1113; *Kronenberger v. Fricke*, 22 Ill. App. 533; *Farnsworth v. Hemmer*, 1 Allen 494; *Panama Tel. Co. v. India Rubber Co.*, L. R., 10 Ch. 515, 526; *McKinley v. Williams*, 74 Fed. 94, 95; *Meeker v. York*, 13 La. Ann. 1820; *Holcomb v. Weaver*, 136 Mass. 265, 266; *Morrison v. Ogdensburg, etc., R. R. Co.*, 52 Barbour 133, 179; *Cleveland etc., R. R. Co. v. Pattison*, 15 Ind. 70, 72; *Everhart v. Searle*, 71 Pa. St. 256, 259, 260; *Hamilton v. Dooley*, 15 Utah 281.)

The findings of the court which are made upon conflicting evidence are entitled to control the facts, unless they are manifestly against the clear weight of the evidence. If there be a substantial conflict upon the evidence, the findings will not be disturbed. (*Dwyer v. Mfg. Co.,* 14 Utah 339; *Walley v. Nat'l Bank,* 14 Utah 305; *Henderson v. Adams,* 15 Utah 30; *McCormick v. Mangum,* 20 Utah 17, 20; *Ranch Co. v. Argile,* 79 Pac. 47.)

It was a contract of partnership for the acquisition and disposal of interests in lands and a division of the profits thereof and it has long been settled in this state that such a contract is not within the statute of frauds. (*Knauss v. Cahoon,* 7 Utah 182; *Coffin v. McIntosh,* 9 Utah 315.)

Authorities in other jurisdictions upon this point are numerous. (*Van Housen v. Copeland,* 180 Ill. 74; *Coward v. Clanton,* 79 Cal. 23; *Fountain v. Menard,* 53 Minn. 443; *Newell v. Cochran,* 41 Minn. 374; *Howell v. Kelly,* 149 Pa. St. 437; *Bates v. Babcock,* 95 Cal. 479; *McElroy v. Swope,* 47 Fed. 380; *Kilbourn v. Lalta,* 5 Mackey 304; *Davis v. Gerber,* 69 Mich. 246; *Babcock v. Reed,* 99 N. Y. 609; *Falkner v. Hunt,* 73 N. C. 571; *Flower v. Bamekeff,* 20 Or. 132; *Case v. Seger,* 4 Wash. 492; *Davenport v. Buchanan,* 6 S. D. 376; *Bruce v. Hastings,* 41 Vt. 380; *Connell v. Mullegan,* 13 Smedes & M. 388; *Evans v. Green,* 23 Miss. 294; *Gibbons v. Bell,* 45 Tex. 417; *Smith v. Crosby,* 47 Tex. 121.)

It was a mining partnership, and it is well settled that such a partnership is not within the statute of frauds. (*Shea v. Nilima,* 133 Fed. Rep. 209, 213.)

It is settled by the authorities that wherever two or more persons enter into an agreement, verbal or written, for the purpose of purchasing or otherwise acquiring or operating a mine or mining property and they actually carry out the agreement by spending their time and money upon it, the one furnishing the money or the other his time, or where they acquire property in the name of both or either, with an agreement to own or operate it together, the property obtained is

partnership property. (*Bank v. Bissell,* 2 McCrary 73; *Kahn v. Smelting Co.,* 102 U. S. 641; *Childers v. Neeley,* 47 W. Va. 70, 34 S. E. 828; *Skillman v. Lachmann,* 23 Cal. 199; *Duryea v. Burt,* 28 Cal. 569; *Perkins v. Peterson,* 29 Pac. 1135; *Moritz v. LaVelle,* 77 Cal. 10; *Settembre v. Putnam,* 30 Cal. 490; *Welland v. Huber,* 8 Nev. 203; *Meagher v. Reed,* 14 Colo. 235, 24 Pac. 681.)

(c) The contract has been fully executed on the side of Rutan, and it would be a fraud upon Rutan after he has made full performance of the contract and rendered services which the record shows it is impossible to adequately compensate in damages, to permit the statute of frauds to be used as a means of fraud. (*Brinton v. Van Cott,* 8 Utah 480; *Lynch v. Coviglio,* 17 Utah 106; *Bates v. Babcock,* 95 Cal. 479; *Coward v. Clanton,* 79 Cal. 23; *Howell v. Kelly,* 149 Pa. St. 473.)

It is uniformly held that the rule as to parol evidence to vary a written instrument is not operative to exclude evidence that such written instrument has been discharged or waived or that the performance of part of it has been dispensed with, or that a particular provision in the contract has been waived. (*Viele v. Insurance Co.,* 26 Ia. 9; *Vroman v. Darrow,* 40 Ill. 171; *Leathe v. Bullard,* 8 Gray 545; *Fuller v. McDonald,* 8 Me. 213, 23 Am. Dec. 499; *Bank v. Kettering,* 106 Pa. St. 531.)

The statute of frauds does not apply to executed contracts so that when the original written agreement has been modified by parol so as to convert the whole agreement into a parol agreement, and when the resulting oral agreement is performed, its performance has the effect which the parties agreed it should have. (*Moore v. Campbell,* 10 Ex. 323; *Leather Cloth Co. v. Hieronymus,* L. R. 10 Q. B. 140; *Swain v. Seamens,* 9 Wall. 254; *Long v. Hartwell,* 34 N. J. L. 116, 127; *Jackson v. Litch,* 62 Pa. St. 451; *Ladd v. King,* 1 R. I. 224, 231; *Cuff v. Penn,* 1 M. & S. 21; *Cummings v. Arnold,* 3 Met. 486.)

There is no doubt on the authorities that the written agreement between Huck and Rutan would create a trust in one-

third of the property purchased in favor of Rutan, with Huck
holding the legal title.    (*Seymour v. Freer,* 8 Wall. 202;
*Townsend v. Vandemerker,* 160 U. S. 171; *Barling v. Pe-
ters,* 131 Ill. 78; *Shaeffer v. Blair,* 149 U. S. 248; *Petrie v.*
*Torrent,* 88 Mich. 58; *Green v. Brooks,* 81 Cal. 333.)

It was a sale to Huck's wife, and a trustee cannot sell the
trust property to his wife. It is a sale to himself, and in sell-
ing he could only have sold his own stock. (*Bassett v. Shoe-
maker,* 20 Atl. 52; *Frazier v. Jenkins,* 64 Kan. 615; *Dun-
das's Appeal,* 64 Pa. St. 325.)

In special or limited partnerships, there is no implied
agency to sell and such a partner in selling sells only his own
interest, unless he sells with the consent of his partner. (*Set-
tembre v. Putnam,* 30 Cal. 491, 496; *Charles v. Eshelman,*
5 Colo. 107; *Judge v. Braswell,* 13 Bush. 67, 11 M. R. 580;
*Harris v. Mayor,* 73 Md. 22, 8 L. R. A. 677; *Dickinson v.
Valky,* 10 B. & C. 128, 34 Rev. 348; 1 Lindley, Partn., sec.
130 bottom p. 302.)


STRAUP, J.

1.    This was an action brought by plaintiffs and respond-
ents against the defendant and appellant to obtain a decree
adjudging that the defendant held in trust for them one-third
of the capital stock possessed by him of the Annie Laurie
Mining Company, and to compel him to account for his re-
ceipts and expenditures in connection therewith.    The sub-
stance of the complaint, so far as material, is:    That on or
about August 11, 1898, Rutan, an experienced mining engi-
neer, and Huck, a capitalist, entered into an agreement
wherein it was agreed that they would jointly engage in the
business of looking for, examining, and purchasing mining
properties, bonds on said properties, and options to purchase
the same, and other interests therein; that Huck was to ad-
vance the necessary purchase moneys, and Rutan to devote his
time, labor, skill, and experience in examining, passing, and
reporting upon the values of prospective or contemplated pur-
chases, and when such properties or interests were pur-
chased the title thereof was to be taken in the name of Huck,

the properties worked, managed, or disposed of, and, out of the proceeds arising therefrom, Huck was to be reimbursed for the moneys advanced by him and the remainder thereof divided between them, two-thirds to Huck and one-third to Rutan; that in pursuance of said contract Rutan devoted time, labor, skill, and experience in looking for and examining properties, and among them examined and reported on the Annie Laurie group of mines situate in Piute county, Utah, and reported to Huck and recommended the acquisition of them or an interest therein, in accordance with said agreement; that such negotiations were had that Huck acquired for himself and Rutan an option upon a quarter interest in said mining properties, advanced moneys in developing them, took up said option, and acquired title to a one-fourth interest in said claims, paying $52,000 therefor, and thereafter conveyed it to the Annie Laurie company and received therefor 5,000 shares of its capital stock of the par value of $100 per share, all of which was done in pursuance of said agreement between Huck and Rutan, and that the stock was held by Huck, two-thirds for himself and one-third for Rutan, subject to Huck's being reimbursed for the moneys advanced by him; that Huck, by way of dividends on said stock, and from sales of a portion thereof, received more than sufficient moneys to cover his advancements and disbursements; an assignment, by Rutan of one-half his interest in his contract with Huck, to Snyder; a demand on Huck, and a refusal by him, for an accounting, and a repudiation by Huck of the contract. The answer admitted Rutan was an experienced mining engineer, Huck a capitalist, and that they were interested together in matters connected with mining properties; but denied that their said interest related to or had any connection with the Annie Laurie properties. It admitted that Rutan examined and reported on said properties; but denied such examination or report had any reference to the alleged contract, or any contract which Rutan had with the defendant. It admitted the defendant acquired a one-fourth interest in said properties for the sum of $52,000, and that he conveyed it to the Annie Laurie company for one-fourth of

its capital stock; that he received dividends on said stock, sold some stock, and still held a large part thereof. It admitted Rutan demanded an accounting, and that the defendant refused to account, and that he repudiated the alleged contract with Rutan. The answer denied all other allegations in the complaint.

The court found all the allegations of the complaint to be true, and made findings accordingly. As conclusions the court held that plaintiffs became the owners of one-third of the 5,000 shares of the capital stock of said Annie Laurie Mining Company, subject to the payment to said Huck out of said common property of the moneys advanced and paid by him with interest thereon, and that plaintiffs were entitled to an accounting. On the matter of the accounting the court found that the defendant's expenditures, after allowing him interest, exceed his receipts, $51,630.26; that the receipts were made up from dividends received, and proceeds from the sale of 500 shares of $100 per share. While the defendant claimed to have sold an additional 1,000 shares to his wife for the sum of $25 per share, and also debited himself with that amount, the court found that such price was inadequate, and, on plaintiffs' objection thereto, such debit item was not allowed, but the defendant was charged with said 1,000 shares of stock and with the dividends paid thereon. Accordingly the court reached the conclusion that the defendant was chargeable with 4,500 shares, and not 3,500, as contended for by him; and that, subject to the said unpaid expenditure of $51,630.26, he should be required to deliver to plaintiffs 1,500 shares, the one-third of 4,500. Plaintiffs offered in court to pay to the defendant the said remaining indebtedness, upon his delivering to them 516.3 shares of said capital stock and also delivering to them one-third of the stock remaining. This offer not being accepted, plaintiffs then offered in court to pay $17,210.09 (one-third of said indebtedness) upon his delivering to them the said 1,500 shares. This offer also was rejected by the defendant. A decree was thereupon entered requiring the defendant to deliver to plaintiffs

1,500 shares of the said capital stock upon their paying to him $17,210.09.

The defendant appeals attacking the findings for want of evidence, and also claiming that the court in adjudicating the accounting should have charged him with the debit item of $25,000, the proceeds of sale of the 1,000 shares to his wife, instead of charging him with the said 1,000 shares and with the dividends thereon.

2. The abstract of the record contains about 700 printed pages of evidence, and space will not permit us to detail all the evidence tending to support the findings. We can only call attention to some of the more prominent features. Both Rutan and Huck admit the making of an oral contract in 1897, substantially as alleged in the complaint. The only material difference between the parties as to the terms of the oral contract is whether Rutan was to have a one-third or a one-fourth interest. On this, Rutan is corroborated by four or five witnesses, who testified that Huck admitted to them that Rutan's interest was one-third. They differ also as to the payment of expenses; Huck claiming he was to and did pay all traveling expenses; Rutan, that he was to pay his own and had paid out about $3,000 traveling and other expenses. It is, in effect, admitted by both parties, that, in pursuance of the foregoing contract, they visited, between the spring of 1897 and 1898, in four or five western states, many different mining properties, some of which were examined and experted by Rutan, and that they traveled 8,000 or 10,000 miles in search of a property, but so far none had proven to be desirable. In 1898, they acquired an interest in a process, called the Greenewalt-Robinson process, for the treatment of refractory ores. The purchase price of this was $3,000, of which Huck paid $2,000, and Rutan $1,000; and thereupon, according to Rutan's testimony, Huck said: "This is now our first purchase, and I think we ought to define it by contract." And, according to Huck's testimony, Rutan said: "Had we not better have our contract drawn defining our in-

terests in this process?" Consequently, on August 11, 1898, the parties executed the following written contract:

"This agreement, made and entered into this 11th day of August, A. D. 1898, by and between Louis C. Huck, party of the first part, and Frank C. Rutan, party of the second part, both of Chicago, Illinois, witnesseth:

"That whereas the parties hereto have by an agreement dated the 8th day of August, 1898, between John E. Greenewalt and William Robinson, parties of the first part, both of Denver, Colorado, and themselves, as parties of the second part, purchased a certain process for the treatment of metalliferous ores; and

"Whereas it is contemplated by the parties hereto that a certain mine or mines may be purchased for the purpose of putting such process into effect; and

"Whereas it is desired by the parties hereto to define their respective interests in the process and the property and machinery to be purchased in connection therewith:

"Therefore this agreement witnesseth: that the parties hereto are the owners of said process and license under the agreement above referred to in the proportion of two-thirds to the party of the first part and one-third to the party of the second part;

"And it is further understood and agreed that in the event any mine or mines shall be purchased and machinery erected for the purpose of putting said process into effect, the party of the first part hereto shall be paid out of the earnings or proceeds of the property, before any division shall take place, the cost of such mines and machinery and all advances made on account of such joint enterprise, and that thereafter the parties shall be interested in the said mines and said system in the same proportion, to wit: two-thirds shall be owned by Louis C. Huck and one-third by Frank C. Rutan."

After the making of this contract the parties began experimenting with the process, testing its usefulness, continued their search for a desirable property, looked at properties having refractory ores, and at some not connected with the process. Other methods of treating ores and different min-

ing machinery were also investigated by them. A Mr. Wei-
mer called the attention of a Mr. Aldrich, an attorney at
Chicago, and also at that time an attorney for Rutan, to the
Annie Laurie and Snyder Improvement properties situate
in Piute county, Utah. Later Rutan, Huck, and Weimer
were brought together. According to Rutan's testimony Wei-
mer gave Huck and Rutan ore from both the Annie Laurie
mine and the Snyder Improvement properties. This ore was
assayed; some pulverized and panned with good results. Huck
testified their attention was then called only to the Snyder
Improvement properties. But in this Rutan is corroborated
by Weimer. The Greenewalt-Robinson process and plans for
a mill were explained to Weimer and the properties discussed
in connection therewith. It was then decided that Huck
and Rutan should go to Utah for the purpose of examining
the properties. About the last of April, 1899, they went to
Utah, saw Senator Cannon, who had an option on both the
Annie Laurie and the Snyder Improvement properties. Upon
their going on the properties an examination was not then
made owing to a recent heavy fall of snow. They returned
to Salt Lake disappointed. Huck expressed dissatisfaction
because their trip had been profitless. Here there is a conflict
in the evidence; Huck contending that they went on the prop-
erty only to look at the Snyder Improvement properties, and
that he knew nothing of the Annie Laurie until he returned
to Salt Lake; while Rutan testified that the Annie Laurie was
talked over and their visit was with respect to that property
as well as the Snyder Improvement. In this Rutan is cor-
roborated by both Weimer and Cannon. After their return
from the property the talk had with Cannon was mainly with
reference to the Annie Laurie mine, and, upon Huck's ex-
pressing an opinion that the purchase of that property in-
volved more money than he cared to put in, a scheme was pro-
posed by Cannon whereby a company could be formed and
the property handled in that way. At this point the evidence
again conflicts; Huck testifying that from here on he and
Rutan were and became promoters for the purpose of hand-
ling and floating the properties, and that, if they were suc-

cessful in so doing, they were to share equally in the profits resulting therefrom; while Rutan testified there was no such understanding, but all that they did from then on was in pursuance of their contracts, the same as they had done theretofore; that, the properties being larger than desired by Huck alone, effort was made by them to interest capitalists and friends of Huck in the enterprise and to join with Huck in the purchase of the properties, if they proved to be desirable. On leaving Salt Lake they stopped at Denver on business connected with the Greenewalt-Robinson process, and on their return to Chicago, and after talking with Gates and others, early in May, 1899, Huck prepared and presented to him a written report describing the properties, especially the Annie Laurie. Rutan returned to Utah and made a most thorough and skillful examination of the Annie Laurie mine, and, on the 20th day of June, 1899, made a most complete and exhaustive report thereon. While making this examination Huck was constantly being informed of the situation and condition of things as they progressed. When the report was completed a copy was furnished to Huck, who furnished one to Gates, and Rutan also submitted his report to Farish, a mining expert for Gates. Farish reported adversely on the property, and Gates did not join in the enterprise. Cannon went to Chicago and urged Huck to buy the properties and insisted that he make a payment. Huck did not do so. Cannon went on to New York, there to interest capitalists in the property. Huck sent Rutan to New York to assist Cannon; but nothing came from these negotiations. Finally W. F. Snyder and Weimer went to Chicago, and later P. L. Kimberly was brought into the conferences with Huck and Rutan; the latter explaining fully to Kimberly the properties and the report he had made thereon. On August 26, 1899, Huck, Rutan, Kimberly, Aldrich, Weimer, and Snyder went to Utah, inspected, and examined the properties. At the mines Kimberly told Huck that, if they could purchase the properties at a reasonable price, he would take half, if Huck would take the other half. Huck, being then undecided, said he would consider the matter and would talk it over with Rutan.

Kimberly and others left the mine and came to Salt Lake, while Huck and Rutan remained at the mine a day or two longer looking at other properties. In the meantime, and on the 1st day of September, 1899, the Cannon option expired. Kimberly left Salt Lake, giving instructions that, if the Annie Laurie could be purchased for $210,000, $5,000 cash and $20,000 in development work covering a period of six months, when the balance was to be paid, and the Snyder Improvement properties for $100,000, he would buy them, providing, according to Rutan's testimony, that Huck would join him in the purchase. This was communicated to Huck, whereupon he replied to Rutan: "I am willing to join Kimberly, if you advise me, in the purchase of the Annie Laurie and take a half interest, but I don't want to buy a half interest in the Snyder Improvement properties." There is also evidence showing that Kimberly was willing and ready to buy the properties on said terms, regardless of Huck's taking any part of it, and wholly independent of him. Huck also left for the east. Here the evidence is again conflicting, and opposite positions are taken by the parties. On the part of Huck it is asserted that, when the Cannon option expired, and when he left Salt Lake, he had abandoned all idea of purchasing any interest in either the Annie Laurie or the Snyder Improvement properties. On the part of Rutan it is contended that Huck had not done so, but was willing to purchase an interest in the Annie Laurie, if Kimberly was, but was not willing to purchase an interest in the Snyder Improvement.

Rutan remained at Salt Lake, and he and Snyder, on the 11th day of September, 1899, in the name of Kimberly, procured an option for the purchase of the Annie Laurie and the Snyder Improvement Company properties upon the terms above stated. These terms were much more favorable to the purchasers than under the Cannon option. Rutan immediately wired Huck that the option had been obtained in the name of Kimberly, and also wrote Huck to see Kimberly and arrange for an interest in the option. In the meantime, Aldrich, who originally was with Weimer representing the sellers in the Cannon option, but at the same time also contended

that he was with Huck and Rutan as purchasers, made arrangements to procure a half interest from Kimberly in his option, and, as Rutan may well have then believed, for the benefit of Huck and Rutan, but very likely secretly intending it for his own personal advantage. Here appellant takes inconsistent positions. First, it is claimed by him that, when the Cannon option expired, he had abandoned all idea of acquiring any interest whatever in the Annie Laurie. Second, that Rutan betrayed Huck in taking the option in the name of Kimberly, and not in the name of Kimberly and Huck. Hence much stress is laid by appellant's counsel on the reply Huck made to Rutan's telegram advising him that the option was had in the name of Kimberly, wherein Huck said the news was "a thunderbolt in a bright sky;" that he had "hoped Senator Cannon would be considered first;" and "has Kimberly, in getting the Annie Laurie, corralled the camp?" If this, as counsel claim, is proof of the second proposition, it certainly disproves the first, and contradicts the positive statements made by Huck that he had abandoned all idea of acquiring an interest in the Annie Laurie. It is corroborative of Rutan's claim that Huck had not abandoned such intention. Huck's reply was, as explained by Rutan, occasioned by a conversation had prior thereto, wherein it was suggested that the new option be in the name of Cannon, but no understanding was had thereon; and, as Cannon had the old option, Huck naturally may have supposed, if a new one was obtained, it, too, would likely be in Cannon's name. There are reasons, however, why the new option could not have been taken in the name of Cannon; primarily because at the expiration of the option held by him he ceased to have any interest in the properties, was in no manner thereafter connected with any of the transactions, was not even on the scene of action, and no one was authorized to, or in fact did, represent him in the matter, nor was he even a prospective or intending purchaser. Snyder and Rutan in no particular represented him, nor had they the slightest authority from him to do anything for him, and had they taken an option in his name it would have been as though they had taken it in

the name of a mere stranger. In addition, Filer, the expert representing Kimberly, insisted that the new option be in the name of Kimberly. This was natural, because Kimberly advanced the $5,000 cash payment; and, too, Kimberly was the principal purchaser, and, according to some of the testimony, was willing, if need be, to assume alone the whole obligation, while, according to all the testimony (except Huck's) Huck was desirous of only a part, and that of the Annie Laurie. Nowhere is it made to appear that this option was taken in the name of Kimberly to prevent or in any way hinder Huck from acquiring an interest in the Annie Laurie; but, to the contrary, the record shows that Kimberly, although under no legal obligation to do so, was at all times willing to have Huck join him in the option and in the purchase of both or either one of the properties. Furthermore, Huck had all along asserted that he did not want, and would not purchase an interest in the Snyder Improvement properties, but that he did want an interest in the Annie Laurie. An option for one, up to this time, was not to be had without taking an option for the other. Hence if the option for both properties had been taken in the name of Huck or jointly in his name with another, it would have been without Huck's authority, and doubtless he would have declined to be bound by it. If, as is the inference from his letter, Huck would have been satisfied if the new option had been in the name of Cannon, from whom he and Kimberly would have been obliged to purchase, if at all, what difference does it make to Huck that the option was in the name of Kimberly, so long as the privileges, conditions, and terms of purchase on the part of Huck were the same? It must also be remembered that, when Kimberly and Huck came to Utah and examined the properties, they came as joint prospective and intending purchasers. Looking now at the testimony of the plaintiffs, Rutan and Snyder, both testified that, after the Cannon option expired, and before leaving Salt Lake, Huck said to them that they were to stay and see what they could do with reference to procuring a new option, and directed them to make the best deal that they could; and that, if Kimberly got the property, he was willing to take a

portion of it with him. Viewing the transaction as a whole, we are satisfied that Rutan acted, in the premises, for the best interest of Huck; that Rutan may well have believed that the arrangements Aldrich made for an interest in the option was, partly at least, for the benefit of Huck, and that he would have no difficulty in acquiring an interest in the option; and that Huck was amply protected, as it proved to be that he was, in the taking of the option in the name of Kimberly. We cannot see wherein Huck would have fared any better had the option been in his name and Kimberly's, or in Cannon's, for Huck got as great an interest in the Annie Laurie as he desired, and, according to his own testimony, all that he was able to handle, and he was permitted to acquire such interest on the same terms as the Kimberly option. The finding of the trial court that Rutan was faithful to the best interests of Huck is amply supported by the evidence.

After the option was procured, Rutan returned to Chicago and explained all the matters connected therewith to Huck. Rutan then saw Kimberly and also Aldrich with reference to Huck's acquiring an interest in the option, and, on Kimberly's request, a meeting was arranged between Kimberly, Huck and Aldrich in Chicago on the 3d day of October, 1899, when Kimberly, in writing, transferred to Huck a one-fourth, and to Aldrich a one-fourth interest in and to the option on the Annie Laurie mine upon the same conditions and terms as in Kimberly's option. Huck could have had an interest in the Snyder improvement properties also, but he did not desire it; consequently he purchased an interest only in the Annie Laurie. There is much conflict in the evidence as to what was said between Huck and Rutan just before the making of this contract wherein Huck acquired his one-fourth interest. According to Huck the following was said by him to Rutan: "I am called here today by Kimberly and Aldrich to decide whether or not I will join them in the bond with Kimberly, and I have got to decide that this morning. I don't want to take an interest in this bond for the reason that it is too large a deal for me; I want to find a small property that we could work together, and I own alone." That Rutan kept on urg-

ing him saying: "I feel it my duty to advise you to take a quarter interest in the bond, because I believe that the Annie Laurie is going to make a great property." And that Huck said: "If I take your advice and take an interest in this bond, you will understand that you will have no interest in my interest, as I have heretofore told you, and our relations will be entirely severed." That Rutan replied: "I am aware and sorry; but it is so." Aldrich, in the main, corroborated Huck. There is no evidence showing that Huck had theretofore said anything whatever to Rutan on the subject that, if Huck took an interest in the bond, or acquired any interest in the Annie Laurie, Rutan was to have no interest in it. Rutan's version of this conversation is that Huck said to him: "We have a meeting here to fix up this contract, and I want to know if it is satisfactory to you, my taking a quarter interest in the Annie Laurie mine, or do you prefer that we drop this entire matter and look for a mine which we will have all to ourselves? Rutan replied: "We have spent a great deal of time and money and we have found nothing, as you know, that presents as promising a future as the Annie Laurie mine, and I advise you to take a quarter interest in both the Annie Laurie and the Snyder improvement Company's properties." Huck said: "I think, if I take anything, a quarter interest in the Annie Laurie is sufficient. Now I will not sign that contract unless you are satisfied. You know that your one-third interest in the contract with me will give you only a one-twelfth interest in the mine." Rutan said: "I know that, but I believe that that one-twelfth interest will be worth more than a one-third interest in any property that we have heretofore seen or examined." The witness Charlton, who also was present and heard this conversation, corroborated Rutan.

Later a corporation was organized, called the Annie Laurie Mining Company, of which Huck was made the manager. Work was immediately commenced developing the properties. Rutan and Huck thereafter officed together in the company's office in Chicago, and, according to Rutan's testimony, they had various discussions as to the method of treat-

ing the Annie Laurie ore, and, in that connection, talked over the Robinson-Greenewalt process with a view of adopting it as a treatment for said ores; but that Kimberly did not desire to experiment with a process not absolutely determined, and so it was not used. They also investigated other processes and methods of treating said ores. They also discussed the assays of ores, and the reports of the underground workings of the Annie Laurie, sent to Huck. Huck admitted their officing together, but claimed that it had no business significance and was only to accommodate Rutan in giving him desk room for private business of his own. Huck, together with the other option holders, sold and conveyed his interest to the Annie Laurie Company, and he received therefor 5,000 shares of its capital-stock. Later the Annie Laurie Company purchased the properties in accordance with the option.

3. It is urged by appellant that the contract declared on in the complaint was the written contract of August 11, 1898; that the said written contract pertains alone to the Greenewalt-Robinson process and to mines purchased in connection therewith; and that the interest which Huck purchased in the Annie Laurie properties was wholly separate and apart from that process. As already shown, according to Rutan's testimony, there is evidence tending to show that the said interest of Huck was purchased in view of treating the ores of the Annie Laurie properties with the Greenewalt-Robinson process, and in addition thereto Rutan testified that some of the said ores could be treated by that process. Conceding, however, that such purchase was not made with reference to or because of the said process, the terms of the contract, as stated in the complaint, are sufficiently broad to include the oral contract as testified to by both parties. It is true the date of the contract alleged in the complaint (on or about the 11th day of August, 1898) is the date of the written contract, while the evidence shows the oral contract was made in April, 1897. But the identity of the contract stated in the complaint is not alone determined by the date, but more from the allegations of the terms and conditions of the contract. If the written contract only defined

the respective rights of the parties in and to the Greenewalt-Robinson process, and concerned only the subject-matter of the process, and did not define the respective·rights of the parties in and to their general business transactions and dealings with respect to the purchasing and acquiring of mining properties, then it was not the contract alleged in the complaint, notwithstanding the similarity in dates. If therefore the written contract is not about the subject-matter of the contract alleged in the complaint, the oral contract certainly is; and hence that will be regarded as the one declared on and the one controlling the case. The complaint alleged the dealings and transactions of the parties with respect to the purchasing and acquiring of mining properties, and with respect to defining their interest therein, and if the written contract was not upon such subject-matter, but was on the subject-matter of the·process alone, plaintiffs were not thereby precluded from proving the allegations of the complaint by other competent evidence showing such a contract.

It is further claimed that Huck's purchase was not made in pursuance of either the oral or written contract existing between the parties. It is apparent from the evidence that Huck entered into the oral contract with Rutan because of the latter's ability and experience as a mining engineer in passing judgment on mining properties and in ascertaining their values. The record shows that, in their travels for a property, Huck desired to, and would at several different times have, purchased properties at great cost that later proved to be valueless had it not been for Rutan's emphatic advice against it. Rutan, at considerable expense of time, labor, and money made a most thorough examination and inspection of the Annie Laurie properties, and, as well as could be done without further exploration and development, tested its value, demonstrated its worth, and made a most complete and exhaustive report thereon. Huck had the benefit of all this. In addition to this, Huck had the benefit of making a personal inspection of the properties with Rutan and the benefit of Rutan's knowledge and experience in pointing out matters and things about the property, showing its worth. Notwith-

standing other experts reported adversely on the property, Rutan held steadfastly to his belief that the Annie Laurie was was a good property; and the subsequent development of the mine proved not only that his judgment was correct, but that the property was of greater value than even claimed by him. Upon the judgment and advice of Rutan Huck depended, and he was controlled thereby in determining whether he would purchase an interest in the property. Just before signing the contract whereby he acquired his interest, Huck still sought the advice of Rutan, and was controlled by it. In reviewing this record, the conclusion is irresistible that the thorough examination made by Rutan of the property, and his complete report thereon, the confidence entertained by him as to its great value, and the advice and directions given by him to Huck with respect to it, was the primary and efficient cause inducing Huck in purchasing the interest; and that the purchase was the direct result growing out of the dealings and relations had and existing between them, as in the complaint alleged and as found by the court, and was by virtue and in pursuance of such relations; and that the purchase was not occasioned by reason of any cause independent thereof.

4. After the signing of the contract whereby Huck acquired his one-fourth interest, Huck drew his check for $1,000, inclosed it with a letter, which was first penciled by Aldrich and then copied by Huck, in a sealed envelope, and handed it to Rutan later in the day at an hotel. The letter, signed by Huck, was: "I am instructed by the gentlemen associated in the bond of the Annie Laurie to hand you the inclosed check for $1,000 as a slight recognition of our appreciation of your services in connection with the transaction. I am also requested to say to you that, notwithstanding the fact that you have declared that you have no claim against the proposed purchasers under said bond, the gentlemen interested intend, in the event that the development justifies your report, to add to the remuneration here made in a substantial manner." Huck testified that, after Rutan read the letter and saw the check, he told him to draw a new check for $500, and to credit the other $500 on a note held by Huck against him.

Huck admitted that of this $1,000 Kimberly contributed $500 and Huck and Aldrich each $250. Rutan testified that, after he read the letter, he asked Huck what it meant, and if it had anything to do with his contract and relations with him; that Huck replied that it had not; that it was only a gift. From this letter and Rutan's accepting the check, several things are claimed—Rutan's assent to the statements therein contained, a settlement, and a corroboration of Huck's version of the conversation had just before signing the contract acquiring his interest in the option. This letter is double entente. While it bespeaks a token of gift offering, within it is couched a meaning, to which it is sought to have Rutan give assent by accepting the gift, to the effect that he has no interest in Huck's purchase in the option. "Claim against the proposed purchasers under said bond" might be understood to mean commissions, or might mean a variety of things; but it is most difficult to give it a meaning having any connection with the contract between Huck and Rutan, especially when considered with the fact that Huck contributed only $250 of the $1,000. Though it may be conceded to be an admission against Rutan, it is, however, only a circumstance to be considered with many others, and against it stand the admissions made by Huck to several witnesses, after all these matters had transpired, that Rutan was interested with him in a one-quarter interest in the Annie Laurie. Nothing can be claimed for this payment by way of settlement. It is apparent that the parties did not bargain and their minds did not meet on any such matter. Besides, it is not pleaded as settlement and that is alone sufficient to dispose of this contention. When the extensive travels of Rutan are considered, his expenses of more than $3,000 paid by himself, his time employed, his examinations made of the Annie Laurie, his aid in procuring the option, his belief in the great value of the properties, and his contract with Huck for an interest, it is not probable that, when Huck was about to purchase the quarter interest in the Annie Laurie, Rutan should, without any consideration, declare, as it is claimed he did, that he was not to have any interest in such purchase, or that he there-

after settled his demand for $1,000. If Huck intended it as a settlement, there was no occasion to resort to language of equivocal meaning. In this connection it is significant that the letter was first drafted by Aldrich and then copied by Huck and by him sealed in an envelope and personally handed to Rutan. There is evidence in the record showing that Adrich was not loyal to Rutan, and at the trial was a hostile witness against his interests. It is quite apparent that Aldrich, in drafting the letter, attempted to carry a meaning in it so obscure as not readily to be discernible, and intended it to be either unnoticed, or apparently collateral to the main thing, the making of the gift.

5. It is also claimed that the assignment made by Rutan to Snyder of the one-half interest in his contract with and claim against Huck was without consideration. So far as Huck is concerned, it matters not whether he discharges his obligation to Rutan alone or to Rutan and Snyder, so long as the discharge when made fully satisfies, as it does, the obligation, and bars all further claim against him with respect to it. It is argued that the $10,000 paid by Snyder to Rutan was not paid as a consideration for the assignment, but was paid to Rutan by Snyder as commission for the sale of the Snyder Improvement properties, from which it is also claimed that Rutan was not true to the best interests of Huck. Rutan and Snyder testified that it was paid for the assignment, and denied that it was for commissions. There is no direct evidence that it paid for commissions. True, in a letter written by Weimer to Aldrich he states that Rutan received $10,000 by way of commissions for the sale of the Snyder Improvement properties; in a letter written by Filer to Kimberly he stated that Rutan asked commissions. Neither Weimer nor Filer in any manner represented Rutan. Their statements, as to Rutan, were mere hearsay. But it is claimed that, because Rutan and Snyder worked together in procuring the option in the name of Kimberly, Rutan was untrue to Huck, and that the just inference is that the said money was paid for commissions. The facts and circumstances surrounding the procuring of the option have been heretofore al-

luded to. Before it can be successfully asserted that the said money was paid as commissions there must be some evidence or some circumstance tending to show such fact. Such evidence is wholly wanting. Were it, however, true that Rutan received the money as commissions for the sale of the Snyder Improvement properties, so far as Huck was concerned it was harmless to him, for he did not purchase any interest whatever in these properties, and at all times asserted that he would not do so. The fact that Rutan might have received commissions for the sale of the Snyder Improvement properties in no manner affected Huck's rights in and to the Annie Laurie properties, or placed on him increased burdens, and in no manner prevented him, from making terms of purchase in the Annie Laurie better than or different from those he did make. The only complaint that he could make of this is that Rutan, as his partner in the transactions, should be required to account to him for the money thus received; but this claim is not made, and were it made it would be unavailable, for the evidence is not sufficient to show that any money was paid to or received by Rutan as commissions from any one. It is argued that, notwithstanding the testimony of both Rutan and Snyder that the assignment was made September 8, 1899, for the then agreed price of $10,000, the facts and circumstances attending the transaction render their testimony improbable. Even if it should be said their testimony in this respect is not probable, it does not necessarily follow that the money was paid to Rutan for commissions, and we have no right to presume that it was so paid, in the absence of evidence showing this fact. Outside of the hearsay testimony there is no such evidence. Upon all the material facts of the case and upon all the contentions made, except the one yet to be reviewed, the evidence is conflicting. Much of appellant's brief is an attempt to demonstrate that the matters and things testified to by Huck are true, and those testified to by Rutan are untrue. This case well falls within the rule so often announced by this court that, where there is a substantial conflict in the evidence, the findings of the court on such conflicting evidence will not be disturbed.

6. We are, however, of the opinion that the court erred in the matter of the accounting. The finding of the court that the 1,000 shares sold by Huck to his wife was for an inadequate price is against the evidence. It is true that transactions between husband and wife, where the rights of third parties may be affected, will be closely scrutinized. Huck testified, and it is not denied, that after he had paid over $60,000 on the property, and when he was called in April, 1900, to meet an assessment on the stock of over $62,000, he did not have sufficient funds to meet it, and therefore called on his wife to help him. She was then the owner of oil and gas bonds, which were sold, and from said sales realized something over $25,000. The character of said bonds, when sold, the amount thereof, the price obtained therefor and from whom, the ownership in Mrs. Huck, the turning of the proceeds of sale over to Huck, and all the circumstances therof were fully detailed. These facts are not denied. The 1,000 shares were sold to her by Huck at $25 per share, the price he paid for it. It was at this time that the Annie Laurie company was about to and did purchase the property under the option. There is nothing to show that the stock at that time had any greater value than $25 per share, or that more than that could have been realized for it. There is no evidence showing what was the market value of the stock in 1900, or that it then had any market value. The evidence shows that its market value in 1902 and 1903 was $100 per share, but that was after the mine was developed and explored. The other stock sold at $100 per share was sold the latter part of 1901 and 1902. So far as Rutan was concerned Huck was under no legal obligation to carry out or complete his purchase under the option, and he had the legal right, even at the time of taking up the option, to abandon the entire transaction, if, for any reason, he thought it was not a desirable purchase, or found himself unable to carry it. Being unable to meet the assessments and to hold the full 5,000 shares, we see no reason why he could not sell a portion of the stock to enable him to carry the remainder, if it became necessary to do so. He was in a position not only to lose all the stock, but also to

lose all the money that he had theretofore paid. The selling of the 1,000 shares being necessary to preserve the common property, so long as Huck acted fairly and in good faith with Rutan; and if he sold the stock for its then market value and accounted to Rutan for its proceeds, Rutan is not in a position to complain of such transaction. The court did not find that there was bad faith on the part of Huck in selling this stock. It only found that the price was inadequate. But there is no evidence showing that the stock when sold was of greater value than the amount realized, or that more could then have been obtained for it. We therefore conclude, and so hold, that the court erred in charging Huck with 4,500 shares of stock on hand, and with the dividends received on that amount of stock. The finding of the court should have been that Huck ought to be charged with 3,500 shares, and with the dividends received thereon; and, instead of charging him with the said 1,000 shares and dividends thereon, he should have been charged with $25,000, the proceeds received by him of the sale; and that the report, as made by Huck, showing his receipts and disbursements, should have been allowed; and that it should be decreed that he be required to deliver to plaintiff's one-third of 3,500 shares, or 1,116 2-3 shares of the capital stock of the Annie Laurie company, upon plaintiffs' paying to him one-third of the unpaid indebtedness due him, or, at his option, a sufficient number of said 3,500 shares to be sold under the direction of the court to pay off and cancel said indebtedness; and that he be required to deliver to plaintiffs one-third of the stock so remaining.

With such modification the judgment of the court below is affirmed. Neither party is given costs on this appeal.

Our attention having been called to the death of the appellant since the submission of the case to us, the judgment of affirmance is entered as of the 1st day of December, 1905, *nunc pro tunc,* a time prior to his death.

BARTCH, C. J., concurs.

30 Utah—16

McCARTY, J.

I dissent; am of the opinion that the judgment should be reversed and a new trial granted.